IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

MICHAEL A. GARRETT           )
                                  )
v.                              )     No. 3:13-0819
                                  )     Judge Nixon/Bryant
SOCIAL SECURITY ADMINISTRATION   )

To:    The Honorable John T. Nixon, Senior Judge

REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. §§ 405(g) and 1383(c), to obtain judicial review of the final decision of the Social Security Administration ("SSA" or "the Administration") denying plaintiff's application for Supplemental Security Income (SSI) benefits, as provided under Title XVI of the Social Security Act. The case is currently pending on plaintiff's motion for judgment on the administrative record (Docket Entry No. 15), to which defendant has responded (Docket Entry No. 20). Plaintiff has further filed a reply in support of his motion. (Docket Entry No. 22) Upon consideration of these papers and the transcript of the administrative record (Docket Entry No. 11),[1] and for the reasons given below, the undersigned recommends that plaintiff's motion for judgment be DENIED and that the decision of the SSA be AFFIRMED.

I.  Introduction

Plaintiff filed his application for SSI benefits on February 10, 2010, alleging

---

[1]Referenced hereinafter by page number(s) following the abbreviation "Tr."

disability February 9, 2010, due to bypass surgery, diabetes, high blood pressure, and high cholesterol. (Tr. 130) His application was denied at the initial and reconsideration[2] stages of agency review, whereupon he requested *de novo* review of his claim by an Administrative Law Judge (ALJ). The ALJ hearing was held on February 9, 2012, and plaintiff appeared with counsel and gave testimony. (Tr. 29-56) Testimony was also received from an impartial vocational expert. At the conclusion of the hearing, the ALJ took the matter under advisement until March 19, 2012, when he issued a written decision in which he concluded that plaintiff was not disabled. (Tr. 15-22) That decision contains the following enumerated findings:

1.    The claimant has not engaged in substantial gainful activity since February 10, 2010, the application date (20 CFR 416.971 *et seq.*).

2.    The claimant has the following severe impairments: cardiomyopathies, status post 4 vessel coronary artery bypass graft and myocardial infarction, obesity, and degenerative joint disease of the knees bilaterally (20 CFR 416.920(c)).

3.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 416.967(c) except [he] can lift and carry 25 pounds frequently and 50 pounds occasionally; can sit a total of 6-8 hours in an 8 hour workday; can stand and walk a total of 4-6 hours in an 8 hour workday; can never climb ropes, ladders or scaffolds; and can occasionally stoop, crouch, kneel, crawl, balance, and climb ramps or stairs.

---

[2]In support of his request for reconsideration, plaintiff alleged a new health condition: "I have no carti[lage] in my knees bone to bone and arthritis setting in[.]" (Tr. 161)

5.      The claimant is unable to perform any past relevant work (20 CFR 416.965).

6.      The claimant was born on February 13, 1963 and was 46 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7.      The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

8.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

9.      Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10.     The claimant has not been under a disability, as defined in the Social Security Act, since February 10, 2010, the date the application was filed (20 CFR 416.920(g)).

(Tr. 17-18, 21-22)

On June 12, 2013, the Appeals Council denied plaintiff's request for review of the ALJ's decision (Tr. 1-3), thereby rendering that decision the final decision of the Administration.  This civil action was thereafter timely filed, and the court has jurisdiction. 42 U.S.C. §§ 405(g), 1383(c).  If the ALJ's findings are supported by substantial evidence, based on the record as a whole, then those findings are conclusive.  Id.

## II.  Review of the Record

The following statement of facts is taken from plaintiff's brief, Docket Entry

No. 16 at pp. 2-6:

Plaintiff Michael Garrett was born on February 13, 1963, and was 46 years old on his alleged disability onset date, February 9, 2010. Tr. 21, 110. As such, he was a younger individual under the regulations.

Mr. Garrett presented to the emergency department on February 9, 2010, with complaints of chest pain for several days which had been worsening. Tr. 190. His symptoms included chest pressure, shortness of breath, nausea, and diaphoresis. Tr. 190. He was noted to have hypertension, which an initial blood pressure of 171/105 and a tachycardic pulse of 104. Tr. 196. He was also noted to have an initial blood sugar which was quite elevated at 445, and was still up at 270 after being given four units of regular insulin. Tr. 196-197.

Upon workup, a cardiac SPECT study was abnormal with findings demonstrating apical, anterior and septal ischemia, as well as abnormalities consistent with ischemic cardiomyopathy. Tr. 226. In addition, an echocardiogram revealed concentric left ventricular hypertrophy with left atrial enlargement suspicious for hypertensive heart with possible mild midseptal hypokinesis. Tr. 240. His initial assessment included newly diagnosed hypertension, uncontrolled, newly diagnosed diabetes mellitus with hyperglycemia, and chest pain with positive Cardiolite SPECT study, for which a cardiac catheterization was planned for the following morning. Tr. 198. Subsequently, this cardiac catheterization revealed significant blockages, including 90% of the left anterior descending, 70% of the obtuse marginal, and 80% of the posterior descending artery. Tr. 206, 235-236. Mr. Garrett's hemoglobin A1c was also noted to be quite high, at 10.8%. Tr. 201. He was advised to transfer to St. Thomas Hospital to undergo coronary artery bypass grafting. Tr. 206, 236.

Upon Mr. Garrett's admission to Saint Thomas Hospital, he was noted to be "a newly

diagnosed diabetic and very hypertensive," and had a "BMI [that was] 40 which is consistent with morbid obesity." Tr. 242. His hemoglobin A1c was again noted to be quite high, at 11%, and his blood glucose was again over 400. Tr. 247, 249-254. Pre-operative x-rays revealed some mild degenerative disc disease of the thoracic spine. Tr. 262. On February 11, 2010, Mr. Garrett underwent coronary artery bypass grafting times four on cardiopulmonary bypass. Tr. 242, 266-267. He was noted to have "really very poor targets," so a couple of arterial grafts to the left side were used in order to try to maximize the benefit from the surgery. Tr. 242. Post-surgical x-rays revealed some pleural effusions and mildly enlarged heart size. Tr. 259-261. It was noted that he was given "routine post-sternotomy instructions," as well as a long discussion of his prognosis, the severity of his disease, and the importance of medical management of his diabetes, hypertension, and dyslipidemia. Tr. 243.

In connection with his application for benefits, Mr. Garrett completed some questionnaires in March 2010 regarding his impairments and fatigue, and the related limitations he experiences as a result. See Tr. 139-143. Mr. Garrett indicated that his insulin makes him feel tired, he cannot work or do lifting over ten pounds, and he cannot walk far distances (although he walked for ten minutes three times per day). Tr. 139-140. He further indicated that he has difficulty finishing tasks due to shortness of breath and weakness, he needs help loading and unloading grocery items, he can only do things or stay on his feet 30-45 minutes before needing to rest, and he must rest for 30 minutes before continuing the task. Tr. 142-143.

Mr. Garrett presented for a consultative medical examination with Dr. Woodrow Wilson on June 4, 2010, at the request of SSA. Tr. 271-274. Dr. Wilson noted that Mr. Garrett was obese, with a height of 69 inches and weight of 272 pounds, he had reduced

range of motion of his right hip and thoracolumbar spine, and he complained of pain in his knees with walking or bending his knees. Tr. 272-273. He also complained of numbness in his left third, fourth and fifth fingers of the left hand and left third, fourth and fifth toes, and was noted to have absent patellar reflexes bilaterally. Tr. 273. Dr. Wilson opined that Mr. Garrett "probably can lift 50 lbs fairly regularly," and could sit for six to eight hours and stand and walk "probably four to six hours each." Tr. 274.

On June 25, 2010, Dr. Frank Pennington reviewed Mr. Garrett's file and records, and provided his opinion regarding Mr. Garrett's capabilities and limitations due to his impairments. Tr. 282-290. Dr. Pennington assessed Mr. Garrett with limitations to lifting and/or carrying twenty pounds occasionally and ten pounds frequently; sitting, standing and walking about six hours each during an eight hour workday; only occasionally performing postural activities, including balancing, stooping, kneeling, crouching and climbing ramps or stairs, and never climbing ladders, ropes or scaffolds; and avoiding concentrated exposure to extreme heat or cold. Tr. 283-286. Dr. Pennington specifically stated that Dr. Woodrow's opinion was "not restrictive enough and does not take pain and fatigue into consideration," and that Mr. Garrett's "allegations of pain, fatigue and limitations appear credible." Tr. 288-289.

On August 31, 2010, Dr. James P. Gregory reviewed Dr. Pennington's opinion and affirmed this assessment. Tr. 291.

Subsequent treatment notes related to Mr. Garrett's impairments show that he continued to struggle with his cholesterol values. Tr. 292-305. For example, his triglycerides were 237 in February 2011 (recommended less than 150) and his HDL or "good" cholesterol was 27 (recommended above 40 and the higher the better). Tr. 296. His blood glucose had

been in better control, and his hemoglobin A1c was 5.8% in February 2011 and a little higher in June 2011, at 6.2%. Tr. 292, 296.

In March 2011, Mr. Garrett followed up with his cardiologist, and he was noted to be "fairly active around his farm but does not exercise regularly." Tr. 303. He reported problems with night sweats and fatigability, and endorsed shortness of breath, snoring, weight gain, diaphoresis, claudication, reflux, dizziness, memory loss, depression, joint pain and myalgia. Tr. 304. He was noted to be obese, with a weight of 275 pounds (BMI of 40.6 using height without shoes). Tr. 304.

In November 2011, Mr. Garrett was treated for follow-up of his cardiovascular disease, and he reported mental status changes since his surgery, as well as feeling nauseated if he overexerts himself. Tr. 300. Mr. Garrett also reported snoring, shortness of breath, weight gain, chest pain, diaphoresis, claudication, dizziness, memory loss, depression, myalgia and joint pain. Tr. 301. He was again noted to be morbidly obese, with a weight up to 290 pounds (BMI approximately 42.8 using his height without shoes). Tr. 301.

The evidence also includes x-rays of Mr. Garrett's bilateral knees from 2007 when he presented with bilateral knee pain for about four months. Tr. 307-311. He stated that they were sore, stiff, aching, difficulty bending after he has been off of them for a while, and feeling that they lock up at times. Tr. 307, 309. He also reported that being on his feet makes his symptoms worse, and staying off of them makes it better. Tr. 307. **X-rays revealed bilateral medial compartment narrowing and near bone-on-bone osteoarthritis bilaterally**, with slight lateral tilt and subluxation of the patellae and bilateral febellae in the posterior compartments of his knees. Tr. 307 (emphasis added). Conservative treatment was planned with the option of cortisone injections in the future. Tr. 307. It does not appear Mr. Garrett

returned, although the records document his ongoing complaints of joint and knee pain and related limitations.

## III. Conclusions of Law

### A. Standard of Review

This court reviews the final decision of the SSA to determine whether that agency's findings of fact are supported by substantial evidence in the record and whether the correct legal standards were applied. Elam ex rel. Golay v. Comm'r of Soc. Sec., 348 F.3d 124, 125 (6th Cir. 2003). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 241 (6th Cir. 2007) (quoting Cutlip v. Sec'y of Health & Human Servs., 25 F.3d 284, 286 (6th Cir. 1994)). While this is a deferential standard, it is not a trivial one; a finding of substantial evidence must "take into account whatever in the record fairly detracts from its weight." Abbott v. Sullivan, 905 F.2d 918, 923 (6th Cir. 1990). Nevertheless, the SSA's decision must stand if substantial evidence supports the conclusion reached, even if the record contains substantial evidence that would have supported an opposite conclusion. E.g., Longworth v. Comm'r of Soc. Sec., 402 F.3d 591, 595 (6th Cir. 2005). Accordingly, while this court considers the record as a whole in determining whether the SSA's decision is substantially supported, it may not review the case *de novo*, resolve conflicts in the evidence, or decide questions of credibility. See Bass v. McMahon, 499 F.3d 506, 509 (6th Cir. 2007); Garner v. Heckler, 745 F.2d 383, 387 (6th Cir. 1984).

B. <u>Proceedings at the Administrative Level</u>

The claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant's "physical or mental impairment" must "result[] from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." <u>Id.</u> at § 423(d)(3). In proceedings before the SSA, the claimant's case is considered under a five-step sequential evaluation process, described by the Sixth Circuit Court of Appeals as follows:

1) A claimant who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings.

2) A claimant who does not have a severe impairment will not be found to be disabled.

3) A finding of disability will be made without consideration of vocational factors, if a claimant is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment in Appendix 1 to Subpart P of the Regulations. Claimants with lesser impairments proceed to step four.

4) A claimant who can perform work that he has done in the past will not be found to be disabled.

5) If a claimant cannot perform his past work, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed.

<u>Cruse v. Comm'r of Soc. Sec.</u>, 502 F.3d 532, 539 (6th Cir. 2007)(<u>citing</u>, <u>e.g.</u>, <u>Combs v. Comm'r of Soc. Sec.</u>, 459 F.3d 640, 642-43 (6th Cir. 2006)(en banc)); 20 C.F.R. §§ 404.1520(b)-(f), 416.920 (b)-(f). "Through step four, the claimant bears the burden of proving the existence

and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work, but at step five of the inquiry ... the burden shifts to the Commissioner to identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity (determined at step four) and vocational profile.  Jones v. Comm'r of Soc. Sec., 336 F.3d 469, 474 (6th Cir. 2003) (citing Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987)).

The SSA's burden at the fifth step of the evaluation process can be carried by relying on the Medical-Vocational Guidelines, otherwise known as "the grids," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule.  See Wright v. Massanari, 321 F.3d 611, 615-16 (6th Cir. 2003).  Otherwise, the grids cannot be used to direct a conclusion, but only as a guide to the disability determination.  Id.; see also Moon v. Sullivan, 923 F.2d 1175, 1181 (6th Cir. 1990).  In such cases where the grids do not direct a conclusion as to the claimant's disability, the SSA must rebut the claimant's *prima facie* case by coming forward with proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert ("VE") testimony.  See Wright, 321 F.3d at 616 (quoting Soc. Sec. Rul. 83-12, 1983 WL 31253, *4 (S.S.A.)); see also Varley v. Sec'y of Health & Human Servs., 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity ("RFC") for purposes of the analysis required at steps four and five above, the SSA is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere.  See 42 U.S.C. §§ 423(d)(2)(B), (5)(B); Foster v. Bowen, 853 F.2d 483, 490 (6th Cir. 1988).

C.  <u>Plaintiff's Statement of Errors</u>

Plaintiff first contends that the ALJ erroneously discounted the January 2007 report of bilateral knee x-rays as revealing only "bilateral osteoarthritis of the knees," when in fact those x-rays revealed "bilateral medial compartment narrowing and near bone-on-bone osteoarthritis bilaterally."  (Tr. 307)  Plaintiff argues that, in failing to reference these findings, "the ALJ significantly mischaracterized and/or misrepresented this evidence in his decision and specifically omitted language indicating the significant severity of Mr. Garrett's knee impairments. . . ." (Docket Entry No. 16 at 10)  However, following a recitation of the x-ray findings, the diagnosis given by the orthopedic physician's assistant who reported the x-ray results was, in fact, "[b]ilateral osteoarthritis of knees."  (Tr. 307)  Moreover, on the day of this orthopedic examination, plaintiff complained of pain at a level of 5 out of 10, had good range of motion in both knees, and had intact muscle strength.  <u>Id</u>.  In view of these complaints and findings, the following treatment was ordered:

> We are going to treat him very conservatively at this time.  We are going to give him a home exercise program to work on strengthening his knee.  He is going to switch from Advil to Aleve over-the-counter as directed on the bottle, and he will take Tylenol as needed for pain.  We did also discuss the option of a cortisone injection at this time, but we are going to save it for a day when he is exquisitely tender.  We will see him in six weeks for a recheck.

(Tr. 307-08)  There is no evidence that plaintiff ever returned to the orthopedist for follow up care, cortisone injections, or other medication needs.  There **is** evidence that he returned to work on his family farm, as the admission records from his 2010 heart attack and bypass surgery note that "[h]e lives on a farm[,] [h]e is a farm laborer and lives with his fiancé[,] ... [and] [h]e does have 70 head of cattle" (Tr. 245), while the discharge summary states that he

"works as a farmer in the Murfreesboro area" and "was active up to this point." (Tr. 242)  As relevant to plaintiff's level of impairment during the period after February 2010, when he alleges disability, the ALJ properly noted that plaintiff reported being able to cook meals, feed his cats and dog, shop, and drive, while also managing to load 50 square bales of hay while working on his farm in 2011.  (Tr. 19, 303)  The ALJ gave additional reasons for discounting plaintiff's allegation of severe knee pain, including the report of consultative examiner Dr. Woodrow Wilson, who observed plaintiff to walk with a normal gait and to have full range of motion of the knees, despite his complaint of "some knee pain" with such maneuvers.  (Tr. 19, 273)  Nonetheless, the ALJ found plaintiff's degenerative joint disease of the knees to be a severe impairment which caused him functional limitations as described in the RFC finding.  (Tr. 17-18)  The undersigned finds no error in the ALJ's consideration of this impairment.

Plaintiff next argues that the ALJ failed to properly evaluate his credibility, in that he did not make clear the weight he accorded plaintiff's allegations and testimony. Plaintiff contends that the credibility finding further suffers from the ALJ's failure to appropriately consider that his morbid obesity would stand to further aggravate his severe knee impairment, as well as his report that his daily insulin injections make him tired.  In plaintiff's estimation, the ALJ places too much stock in plaintiff's reported ability to engage in simple household functions, and in his report to Dr. Mioton that he continued to do some work around his farm, including loading 50 bales of hay.[3]  However, the undersigned cannot

---

[3]On March 1, 2011, Dr. Mioton reported the following history in describing plaintiff's return visit to his office:

Michael returns for a visit.  He's had no symptoms of angina or CHF.  He was last seen

agree that the ALJ's credibility determination suffers from a lack of clarity, or from any improper weighing of the evidence which informed it. While plaintiff argues that cooking, caring for pets, shopping, and driving are "minimal activities [that] are mostly insignificant, and certainly intermittent" (Docket Entry No. 16 at 13), these activities, identified by plaintiff on agency questionnaires, were not the only activities considered by the ALJ. Although plaintiff would have Dr. Mioton's March 2011 report of his recent farming work considered apart from his daily activities, and portrays it as a red herring which kept the ALJ from fulfilling his duty to consider the record as a whole (Docket Entry No. 16 at 12), it is clear to the undersigned that the ALJ properly considered this farm work alongside plaintiff's reported daily activities (Tr. 19), as evidence which undermined plaintiff's complaints of severe knee pain, fatigue, and lifting limitations, and which also justified the rejection of the more significant lifting limitations assessed by the nonexamining state agency consultants, who "were not priv[y] to the treating cardiologist's note[.]" (Tr. 20)

Plaintiff testified that he believed he could only carry ten pounds without pain. (Tr. 47) The consultative examiner, Dr. Wilson, opined that plaintiff "probably can lift 50 lbs fairly regularly." (Tr. 274) The state agency consultants disagreed with Dr. Wilson and opined that plaintiff could lift and carry twenty pounds occasionally and ten pounds

---

in December. He continues to be fairly active around his farm but does not exercise regularly. He follows with an endocrinologist in Nashville. He is a nonsmoker. He states that he's been requested to see me to render an opinion about his ability to do any form of work. He has various problems with night sweats and fatigability. He is able to do some work around his farm and recently loaded 50 square bales of hay. He has no obvious symptoms of angina and has no symptoms of palpitations or syncope.

(Tr. 303) Dr. Mioton noted that plaintiff's physical examination was normal, and opined that his cardiovascular health was stable and his diabetes was well controlled. (Tr. 304)

frequently. (Tr. 283, 291) Without knowing the exact weight of a square bale of hay such as that found on plaintiff's farm, the undersigned finds substantial support for the notion that plaintiff's ability to load fifty such bales is indicative of a greater capability to perform exertional work than he alleges, if not the capability to lift 50 pounds on a fairly regular basis, as opined by Dr. Wilson. Furthermore, while plaintiff testified that his post-operative heart condition is the major problem that keeps him from working (Tr. 35), in that physical exertion causes him to get hot, short of breath, and lightheaded (Tr. 37), his cardiologist -- whom plaintiff specifically engaged to provide "an opinion about his ability to do any form of work" (Tr. 303) -- found his heart condition to be "stable postop" and did not identify any enduring limitations. (Tr. 304) "Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence." Walters v. Comm'r of Soc. Sec., 127 F.3d 525, 531 (6th Cir. 1997). Confronted with such contradictions in this case, the ALJ appropriately found plaintiff to be limited by the symptoms of his severe impairments, but not so limited as to be totally disabled.

Finally, plaintiff argues that the ALJ's determination of his RFC is not supported by substantial evidence. He argues that because he "has undergone quadruple bypass grafting, x-rays show near bone-to-bone osteoarthritis of the bilateral knees, and he is morbidly obese with weight gain" (Docket Entry No. 16 at 15), the finding of an ability to perform medium work is untenable. He further claims that the opinions of the nonexamining state agency consultants are in agreement with the finding of the ALJ that Dr. Wilson's assessment of plaintiff's lifting capacity is overly optimistic, but otherwise contain "significant inconsistencies" with the ALJ's RFC determination based on the remainder of Dr.

Wilson's functional assessment.  Id. at 15-16.  He therefore argues that the ALJ was bound to explain his resolution of these inconsistencies, yet failed to do so.  Id.  However, the undersigned finds no such unexplained inconsistencies.  There is no material difference between the RFC finding and the assessment of the nonexamining consultants with respect to limitations on sitting, standing/walking, or postural maneuvers.[4]  While the consultants also assessed a limitation against concentrated exposure to temperature extremes, the ALJ specifically found that this limitation, while common in cardiac patients, was not assessed by either the treating cardiologist or the consultative examiner, nor was it otherwise supported in the medical record.  (Tr. 20)  Plaintiff somehow construes this rationale as a substitution of the ALJ's own opinion for the medical judgment of the nonexamining consultants, but it clearly is no such thing; rather, it represents a weighing of the opinion evidence that is in accord with the hierarchy of such evidence established in the regulations, where greater deference is generally owed the opinions of treating and examining sources versus those of nonexamining sources.  20 C.F.R. § 416.927(c).  Moreover, as previously discussed, the ALJ explained that his rejection of the consultants' assessment of lifting restrictions was based on plaintiff's subsequent report of significant farm work, and further made note of those consultants' observation that plaintiff's obesity did not complicate his functioning beyond

---

[4]The state agency consultants assessed plaintiff with limitations to lifting and/or carrying twenty pounds occasionally and ten pounds frequently; sitting, standing and walking about six hours each during an eight-hour workday; only occasionally performing postural activities, including balancing, stooping, kneeling, crouching and climbing ramps or stairs, and never climbing ladders, ropes or scaffolds; and avoiding concentrated exposure to extreme heat or cold.  (Tr. 283-286)  The ALJ disagreed with the aforementioned lifting and environmental limitations, but included in his RFC determination that plaintiff can sit a total of 6-8 hours in an 8-hour workday; can stand and walk a total of 4-6 hours in an 8-hour workday; can never climb ropes, ladders or scaffolds; and can occasionally stoop, crouch, kneel, crawl, balance, and climb ramps or stairs.  (Tr. 17-18)

the assessed limitations, indicating his own consideration of obesity in arriving at his RFC finding. This explanation of the ALJ's rationale is entirely sufficient, and the RFC finding in this case is substantially supported by the medical evidence and the record as a whole.

## IV. Recommendation

In light of the foregoing, the Magistrate Judge recommends that plaintiff's motion for judgment on the administrative record be DENIED and that the decision of the SSA be AFFIRMED.

Any party has fourteen (14) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court. Any party opposing said objections shall have fourteen (14) days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific objections within fourteen (14) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. Thomas v. Arn, 474 U.S. 140 (1985); Cowherd v. Million, 380 F.3d 909, 912 (6th Cir. 2004)(en banc).

**ENTERED** this 25th day of May, 2016.


 s/ John S. Bryant
JOHN S. BRYANT
UNITED STATES MAGISTRATE JUDGE